EDNA F. GRAHAM, Individually and as Ex'r of the Will of George Graham, Deceased, Plaintiff-Appellee, *v.* THE CITY OF SPRINGFIELD, Defendant-Appellant.

(No. 12200;

Fourth District—November 14, 1974.

Richard L. Lott, of Springfield, for appellant.

Graham and Graham, of Springfield, for appellee.

Mr. PRESIDING JUSTICE SMITH delivered the opinion of the court:

Plaintiff sued the City of Springfield for damages to crops by flooding for 4 specific years alleging negligent operation in the operation of its dam impounding an artificial lake—Lake Springfield. Following a bench trial, damages were assessed for 2 years in the amount of $15,151.40. The City appeals arguing that the verdict is against the manifest weight of the evidence thus presenting to us the question of law as to whether the facts are inadequate to support the judgment that the City negligently and proximately caused the flooding resulting in damage to the crops. No issue is made as to the amount of damages—only, as we have said, the propriety of such.

That the City owed a duty to plaintiff to manage the dam in a manner so as not to cause unnecessary and excessive flooding is not disputed, that is, to so control the dam gates that such would not occur. The circuit court found that in the years of 1958 and 1960 there were occasions when the gates were lowered or opened "at a time when the lake was dropping." Such acts, it said, constituted negligence.

This issue of law requires a recital of facts. Lake Springfield is owned by the City and was created in 1933. The dam creating the lake is about a fourth of a mile upstream from the farm of plaintiff. There are five concrete spillways. Each gate is 45 feet in length and the outlet gates are of the rolling drum type, which when raised to their highest point are 560 feet above sea level. They can be lowered 8 feet to 552 feet. The lake area is about 7 square miles and has a watershed of approximately 265

square miles. The gates can be lowered and raised as conditions dictate. In this regard, defendant reminds us that we must take into account in judging the conduct of the City the options available to the dam operator. This is correct, in our opinion, and we have it in mind in determining whether in the overall context, the negligence found by the trial court is against the manifest weight of the evidence.

During the 2 years in question, there was, as might be expected, a superfluity of rain. This event, naturally, dictates a careful operation of the gates so as to prevent not only the flooding of the City's power-generating facility at 562 feet, but the flooding of shoreline owners—possibly upstream owners on the creek flowing into the lake—and flooding downstream owners such as plaintiff. A judgment factor is involved as to just how much water is to be let out of the lake—that is, just how much should the dam be lowered and raised. This judgment partakes of anticipating how much water is flowing into the lake, which involves, as a concomitant, knowledge as to the saturation of the ground in the watershed. Obviously, there is an area where discretion is at large—that is, where judgment factors are so balanced that several alternatives may be correct, and the City argues that its conduct on the two occasions involved was in this area. This argument, of course, implies that during a period of heavy rain the dam will have to be lowered sufficiently to take care of the increased inward flow, and it implies further that sometimes flooding cannot be avoided. An expert estimated that if the five gates were down to 1 foot below the surface of the lake, the water would pass over them at the rate of 750 cubic feet per second; if 2 feet, 2,120 cubic feet per second, and if 3 feet, 3,900 cubic feet per second. He also testified that the channel running through plaintiff's farm—the full bank stage—could carry 2,500 cubic feet per second unless the river it runs into—the Sangamon—occasioned a backup. Plaintiff's property is located in a flood plain and defendant argues, therefore, that it is likely to be inundated regardless of how the dam is operated.

In 1958, the last days of July and the early days of August brought heavy rainfall and heavy flooding. Plaintiff argues that the dam was lowered all the way—8 feet for several hours on August 1 which caused the flooding and that such excessive lowering was uncalled for and hence negligent. For July 30, an exhibit showed that the lake level was 559.97 in the middle of the afternoon and thereafter rose steadily due to heavy rains and attained a maximum level of 561.34 feet. On July 31, at 10:50 P.M., and on August 1, at 2:10 P.M., the lake gradually *receded* reaching a level of 561.10 feet at 2:10 A.M. The operator of the gates at that point *lowered* two gates to the maximum distance of 8 feet with an additional gate being set at the level of 555.4 feet. The City urges that

on a calculated inflow into the lake during this period of time there would be approximately 4,652 cubic feet per second, and regardless of the dam, the creek flowing through plaintiff's land could not have accommodated this amount of flow. Defendant points to a creek which by-passes the lake and connects with the creek through plaintiff's farm some way downstream therefrom, to support the hypothesis that there would have been flooding in any event—the witness testified as to the cubic feet per second pouring from this secondary source—and that a resultant 8-foot flooding would extend all the way back to the dam and hence over the farm.

As to 1960, there were heavy rains towards the end of the month of June. As to the year 1960, on June 23 at 2:45 P.M. the lake level was 561.01. At this time gate 1 was opened to a level of 555.6, or 4.4 feet, and gate 5 was opened to 556.5 feet, or 3.5 feet. In the next hour the level *dropped* .05 feet. There is no further recording of the level for 5 hours and 25 minutes. However, at 3:05 P.M. gate 1 was dropped to 553, and stayed at that level for 5½ hours. Gate 5 was dropped to 556.3 at 3 P.M. and 556.2 at 4 P.M. Between 3:45 P.M. and 9 P.M., the lake had dropped another .21 foot. On June 25, at 9:35 P.M. gate 1 was completely closed.

It is obvious that on July 30, 1958, at 11:50 P.M. the lake was falling rapidly. Why gates 2 and 3 were then opened for 8 feet is beyond comprehension—it is no answer or rather no explanation, that the gate operator anticipated that the lake might rise because it might rain again. In our experience, it is always going to rain sometime in the future! As an aside, at no other time during the 4-year period was even one gate opened to 8 feet. The same is true as to 1960. There is no explanation whatsoever in the record for lowering the dam so substantially when the lake had started to fall.

Plaintiff's testimony was to the effect that except for two low places of approximately 15 acres there was no flooding on the farm from this by-pass creek when it was out of its banks. Likewise, that there had been no prior crop loss of any extent prior to the building of the dam. However, in July, 1958, only 60 acres escaped damage out of 300. During the pertinent period in that year, though the corn was 7 feet tall, the water rose in a 12-hour period and completely covered it. After 6 or 8 hours it receded and the flow of water was always from the dam and not from the by-pass creek which connects down stream from the farm with the creek flowing from the dam. There is no tributary from the creek flowing through plaintiff's farm between the dam and the by-pass creek.

Another witness for plaintiff testified that he was farming in a similar area in July, 1958 and that water flooded out some of his land to a depth

of 7 feet. He said that the flood came from the gates as the water rose so fast. He said it could not have come from the by-pass creek as the current was in a different direction, that is, down from the dam rather than backup. Another witness who had worked on plaintiff's farm for 23 years prior to 1972 testified that the current in the creek indicated where the flooding came from—that is, from the dam.

The engineer employed by the city, David Wyness, though not so employed during the pertinent years, was in charge of the management of the gates on 1972. When asked to give a good reason for the action taken on August 1, 1958, at 2:10 A.M. when the dam had one gate opened 3 feet and the lake was falling, for opening two more gates a full 8 feet, he testified that his records showed .80-inch rain on that evening at 9:30 P.M. We would note here that the gates were so opened—one at 3 feet and two at 8 feet—for many hours before the rain he referred to. Gates 2 and 3 were closed at 5 P.M. and 4:45 P.M. and after the first rain and before the second. The lake level had been falling for 5 hours with one gate opened at 3 feet, before the other two were opened 8 feet. The engineer's explanation, if one could call it that, is hardly satisfactory, and this lack of any reasonable reason is one from which the court could properly infer negligence. The engineer testified that the decision to open the gates in full was not based upon the lake level but upon the anticipated lake level. Thus, the gates were then closed when the rain started coming down because, or so he testified, the lake was falling. He testified that it would be a proper procedure to raise or lower the gates a little at a time to see what effect this could have on lake level.

██ There is, in our opinion, sufficient testimony on which the circuit court could base a finding of negligence. We are not limited to documentary evidence—there were eyewitnesses as to the water flowing from the dam. Suffice it to say it is reasonable to find negligence in the act of lowering the dam when the lake itself is going down. There was data which shows that more water was being discharged than flowing in. There was no explanation as to why the two gates were dropped to their full level. These facts justify a conclusion of negligence—certainly, absent any explanation—or any satisfactory explanation. It needs no citation of authority that a reviewing court is not a super-factfinding body. In short, we are not at liberty to substitute our judgment as to the facts—which is not to say that we would have found differently. The judgment appealed from is well within the evidence; that is, it is not manifestly against the weight of the evidence. Accordingly, the judgment appealed from is affirmed.

Affirmed.

CRAVEN and SIMKINS, JJ., concur.